IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RONALD P. DALTON, | ) | Case No. 5:24-cv-00696 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN |
| | ) | BRENNAN |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF | ) | REUBEN J. SHEPERD |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |

I.    **Introduction**

Plaintiff, Ronald P. Dalton ("Dalton"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards, I recommend that the Commissioner's final decision denying Dalton's application for DIB be vacated and that Dalton's case be remanded for further consideration.

II.    **Procedural History**

Dalton filed for DIB on November 8, 2021, alleging a disability onset date of July 14, 2021. (Tr. 273-79). The claims were denied initially and on reconsideration. (Tr. 164-77, 180-91). He then requested a hearing before an ALJ. (Tr. 208-09). Dalton, represented by counsel, and a vocational expert ("VE") testified before the ALJ on April 6, 2023. (Tr. 60-88). On May

17, 2023, the ALJ issued a written decision finding Dalton not disabled. (Tr. 38-55). The Appeals Council denied his request for review on March 22, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; see 20 C.F.R. §§ 404.955, 404.981). Dalton timely filed this action on April 18, 2024. (ECF Doc. 1).

III.    **Evidence**

A.    **Personal, Educational, and Vocational Evidence**

Dalton  was 50 years old on the alleged onset date, making him an individual closely approaching advanced age according to Agency regulations. (*See* Tr. 53). He graduated from high school. (*See* Tr. 67). In the past, he worked as a water truck driver, cut off saw operator, light truck driver, flatbed truck operator, and laborer. (Tr. 82-83).

B.    **Relevant Medical Evidence**

On July 14, 2021, Dalton was admitted to the hospital following a motorcycle accident. (Tr.684). Treatment notes indicated the following acute traumatic injuries following the crash: left frontal lobe intraparenchymal hemorrhage, subdural hematoma, trace subarachnoid hemorrhage, left occipital calvarium fracture with extension the left jugular foramen and left occipital condyle, multiple bilateral rib fractures, trace right pneumothorax, diastasis of pubic symphysis with adjacent small pelvic hematoma and small hematoma along the bilateral pelvic wall, age indeterminate superior endplate deformities of T3 - T5, 6cm laceration of the right bicep, comminuted fracture of inferior aspect of T3 vertebral body extending into the T3-5 intervertebral disc space, displaced right ulnar styloid process fracture, right distal radius fracture, bilateral sacral fractures with extension into the L5-S1 disc space. (Tr. 942). During his hospitalization he had multiple procedures, however, pertinent to this case, on July 17, 2021,

William David Lanzinger, Jr. M.D. performed a closed reduction and percutaneous pinning of Dalton's right distal radius fracture. (Tr. 760, 768).

He was discharged in stable condition on July 31, 2021, for inpatient rehabilitation. (Tr. 942).  Dalton participated in intense inpatient rehabilitation that consisted of therapies three hours per day, five days per week until his discharge on August 27, 2021. (Tr. 571-73). Dalton received physical, occupational, and speech/language therapies during that time. (Tr. 571). At discharge, Dalton partially met his long-term goals due to continued need for cues for weight bearing compliance and impulsivity. (Tr. 569). Dalton was noted as "impaired" on the following: sustained attention to tasks and required intermittent cues with 15 minutes of activity, safety awareness, insight into deficits, and complex problem solving with minimal cues. (Tr. 568). His condition had improved at discharge; however, he was limited to no strenuous activity with his right upper extremity, and no weight bearing until September 2, 2021. (Tr. 570). His course of rehabilitation was complicated by his severe agitation and post-traumatic brain injury confusion, which required restraints and Seroquel. (Tr. 571). However, he had substantially improved the week and a half prior to his discharge and was more redirectable, responsive, and aware of the reason for his rehabilitation. (*Id.*).

Dalton presented for a post-operative appointment with Dr. Lanzinger on September 15, 2021. (Tr. 673). Dalton reported that he was doing well and that his wrist pain was managed without medication. (*Id.*). Upon examination, there was limited range of motion with normal sensation. (*Id.*). Imaging showed migration of pins and displacement of radial styloid fracture with loss of reduction. (*Id.*). Dr. Lanzinger was "not pleased" with Dalton's healing progress which was complicated by the pin migration, fracture, and loss of reduction. (*Id.*). Dr. Lanzinger removed the pins and instructed Dalton to start working on range of motion therapy. (*Id.*).

On October 14, 2021, Dalton presented for an appointment with Lixin Cui, M.D., with a chief complaint of impaired short-term memory and anxiety. (Tr. 372). Dr. Cui noted that Dalton was oriented to month, year, place, and president. (*Id.*). His judgement was grossly intact, he was able to abstract reason, and was able to spell "face" but unable to spell "world." (Tr. 373-74). Dr. Cui's impression was a traumatic brain injury ("TBI") and he prescribed outpatient physical, occupational, and speech therapy. (Tr. 374).

Dalton presented for a speech therapy evaluation on October 22, 2021, with a chief complaint of reduced memory since his accident. (Tr. 664). Dalton had a medical diagnosis of TBI with a treatment diagnosis of cognitive-communication deficit. (*Id.*). He indicated during the evaluation that he had previous undiagnosed TBI's. (*Id.*). Following the administration of the Cognitive Linguistic Quick Test, the speech therapy impression was mild cognitive-linguistic deficits around short-term memory, per Dalton, post TBI. (Tr. 665). He had a good therapy prognosis and was suggested to attend speech therapy once a week for six weeks. (Tr. 666).

On October 29, 2021, Dalton presented for an occupational therapy initial evaluation. (Tr. 662). On examination, Dalton's active range of motion measurements were as follows: forearm supination 53 degrees, forearm pronation 86 degrees, wrist flexion 46 degrees, wrist extension 41 degrees, radial deviation 14 degrees, ulnar deviation 14 degrees. (Tr. 663). Dalton was able to make a functional fist with his right hand and was estimated to be at 95% strength. (*Id.*). However, he was struggling with hook and straight fisting. (*Id.*). His finger extension was functional, and he could oppose his thumb to each finger. (*Id.*). Dalton's right grip was 17 pounds compared to 75 pounds on the left side. (*Id.*). Similarly, his right lateral, three-point, and two-point pinches were each weaker compared to those same pinches on the left. (*Id.*). His wrist pain level appeared to be mild to moderate. (*Id.*). Following the evaluation, his therapeutic

diagnoses included decreased range of motion, decreased strength, and edema. (Tr. 662). Dalton had good rehabilitation potential and was prescribed occupational therapy twice a week for six weeks. (Tr. 663).

Dalton saw Dr. Lanzinger for a follow up appointment on January 12, 2022. (Tr. 1422). Dalton complained of moderate pain in his right thumb and weakness in his right wrist without numbness or tingling. (*Id.*). Upon examination, Dr. Lanzinger noted there was an obvious deformity to the wrist with prominence of the distal ulna dorsally. (Tr. 1424). Dalton's range of motion was limited secondary to pain, and he had mild tenderness to palpitation over the radiocarpal joint. (*Id.*). His sensation was intact to light touch distally and he could wiggle all of his fingers. (*Id.*).  Imaging showed a malunion of the distal radius and a step-off of intra-articular radial styloid fracture between the lunate and scaphoid fossa of the radius. (*Id.*). Dr. Lanzinger discussed possible treatment options, including possible surgical options with Dalton "in depth[.]" (*Id.*). After discussion, a course of treatment suited for Dalton was established, but no additional detail was provided. (*Id.*).

Dalton presented for an appointment with Ryan Drake, D.O., on June 1, 2022, with a chief complaint of memory problems. (Tr. 1399). Dr. Drake referred Dalton for neurocognitive testing to determine Dalton's baseline in connection with his TBI and prescribed Zoloft 50mg for Dalton's mood disorder. (Tr. 1401).

Dalton presented for an appointment with Michael McCombs, D.O., on July 11, 2022, with a chief complaint of Alzheimer's Disease and anxiety. (Tr. 1442). Dalton reported having memory problems for months without precipitating event. (*Id.*). On examination, Dr. McCombs noted that Dalton was alert and oriented and that his recent and remote memory were intact. (Tr.

1444). Dr. McCombs assessed Dalton with unspecified dementia without behavioral disturbance. (*Id.*).

On September 15, 2022, Taylor Moresea, PA-C in Dr. Drake's office wrote a letter indicating that Dalton cannot drive and therefore cannot take his CDL test due to his history of TBIs and mood disorder. (Tr. 1406).

On September 27, 2022, Dalton saw PA Moresea. (Tr. 1433). Dalton reported that his Zoloft helped keep his anger at bay. (Tr. 1434). Dalton reported he had not heard back about a psych referral. (Tr. 1434). PA Moresea noted that a neurocognitive evaluation showed changes due to his TBI, and she was hopeful there would be improvement over time. (Tr. 1435).

Dalton saw Lindsay Fascione, PMHNP[1] on November 9, 2022, for his issues with memory, rage, irritability, and anger. (Tr. 1458-62). Dalton reported that his wife recently had to call police while he was driving because he became so angry at another driver, he was flicking them off and trying to run them off the road. (Tr. 1458). Dalton also reported he began stuttering. (*Id.*). Dalton further reported memory issues and that he often forgets the time and how to do things. (Tr. 1467-68). NP Fascione diagnosed Dalton with major depressive disorder, single episode, severe, generalized anxiety disorder, and attention-deficit/hyperactivity disorder, combined presentation. (Tr. 1459). Dalton was prescribed sertraline, gabapentin, and Seroquel. (Tr. 1458).

Dalton saw NP Fascione again on December 7, 2022. (Tr. 1476). Dalton complained that he still had trouble with his memory, and he was "'forgetting everything.'" (Tr. 1488). After this encounter, NP Fascione diagnosed Dalton with major neurocognitive disorder due to multiple

---

[1] NP Fascione completed a Mental Status Questionnaire as part of the medical record. (See Tr. 1454-57). At that time, she signed the report CNP. All other references will be to NP consistent with the corresponding medical records.

etiologies, severe, with mood symptoms and depressive disorder due to another medical condition. (Tr. 1487). She prescribed him Vraylar 1.5 mg. (Tr 1476).

Dalton presented for another appointment with NP Fascione on January 9, 2023. (Tr. 1487). NP Fascione noted that Dalton's memory was intact during this visit. (Tr. 1488).

Dalton presented to an appointment with PA Moresea on January 10, 2023. (Tr. 1430). Dalton presented with concerns of memory loss, having a short fuse, and concentration difficulty. (Tr. 1431). PA Moresea noted that she will continue to monitor Dalton's TBI for improvement and will continue to work on his medications with psychiatry for his mood disorder. (Tr. 1432).

On January 11, 2023, Dalton saw Dr. McCombs for a follow up appointment. (Tr. 1448). Dalton's chief complaints were Alzheimer's Disease, anxiety, arthritis, and right wrist pain. (*Id.*). Dalton reported that he had memory loss since birth, and that there was no precipitating event. (*Id.*). Upon examination, Dalton's recent and remote memory were intact. (Tr. 1449). Dr. McCombs referred Dalton to an orthopedic surgeon for his wrist pain. (Tr. 1450). Dalton presented for an appointment with PA Fascione on March 15, 2023. (Tr. 1499). Dalton reported that he could not function or focus on a task long enough to complete it and did not know his purpose. (Tr. 1500). PA Fascione noted Dalton's memory at baseline during this encounter. (*Id.*).

## C.    **Medical Opinion Evidence**

Dalton presented for a medical consultative exam with William Zuke, M.D. on March 15, 2022. (Tr. 1366-75). Upon examination, Dr. Zuke noted Dalton had no peripheral edema or clubbing in his extremities but had small scars on his right wrist where his wrist fracture was fixed. (Tr. 1368). Dalton had decreased pronation and supination of his right wrist and had radial ulnar deviation. (*Id.*). Upon a muscle examination, Dalton scored a four, which meant strength

7

was reduced, but contraction could still move joint against resistance, in the following categories on his right upper extremity: wrist flexion, wrist extension, wrist radial deviation, wrist ulnar deviation, thumb M.P. and I.P. flexion and extension, thumb CMC adduction, abduction, and opposition, index finger M.P. flexion and extension, index finger P.I.P. flexion and extension, and index finger D.I.P flexion and extension. (Tr. 1370). Dalton had a normal range of motion in his right wrist with the exception of ulnar deviation which was at 0-15 degrees and radial deviation which was at 0-10 degrees. (Tr. 1372). An x-ray of Dalton's right hand showed bony structures intact with moderate degenerative changes in the interphalangeal joints. (Tr. 1375). Further, there was no fracture, dislocation, or bony erosion. (*Id.*).

Neurologically, Dalton made good eye contact and was able to converse appropriately with fluent speech. (*Id.*). Dalton's mood was appropriate, and he demonstrated clear thought process and good concentration. (*Id.*). Dr. Zuke diagnosed Dalton with posttraumatic arthritis of right wrist and previous head injury. (*Id.*). Dr. Zuke noted, "regarding his brain injury he seems to be conversing and mentally appropriate at this point in time during this encounter despite the recent trauma and subsequent recovery." (Tr. 1369).

Dalton presented for a psychological consultative exam with Bryan J. Krabbe, Psy.D., on March 17, 2022. (Tr. 1358-65). Dalton reported to Dr. Krabbe that he was enrolled in special education services in school and had problems staying focused. (Tr. 1359). Dalton also stated that he was "'different'" after the accident; he now has issues with being sad all the time, feeling stuck and worthless, and having a bad memory. (Tr. 1360). His daughter, who was present for the exam, stated that he gets angry easily and will become frustrated when he cannot remember something. (Tr. 1360). Dalton explained that he spends his time watching YouTube videos and whittling. (*Id.*).

8

Dr. Krabbe administered the Wechsler Adult Intelligence Scale – IV ("WAIS-IV") test to test Dalton's overall intellectual development. (Tr. 1362). Dr. Krabbe noted that results of the WAIS-IV "should be viewed with caution as he was very restless and appeared to be in a lot of pain" during examination. (*Id.*). Dalton scored "borderline" in the categories of verbal comprehension and processing speed and "extremely low" in perceptual reasoning and working memory. (*Id.*). Dalton also scored an "extremely low" full scale IQ score of 63.[2] (*Id.*).  Dr. Krabbe also administered the Wechsler Memory Scale – Fourth Edition ("WMS-IV"). (Tr. 1362-63). On the WMS-IV, Dalton scored "average" in visual memory index, visual working memory index, and total immediate memory and "low average" in auditory memory index and total delayed memory. (Tr. 1363).

Dr. Krabbe concluded that Dalton's memory, arithmetic skills, and general intelligence appeared to fall within adequate limits to manage his funds. (*Id.*). He also concluded that Dalton's short-term memory skills were adequate, but that his attention and concentration skills were below average. (Tr. 1364). Dr. Krabbe further noted that Dalton's intellectual functioning scores were invalid due to pain and restlessness. (*Id.*). Following evaluation, Dr. Krabbe diagnosed Dalton with adjustment disorder with mixed anxiety and depressed mood and unspecified stimulant-related disorder, in sustained remission. (*Id.*).

According to Dr. Krabbe, Dalton retained adequate ability to remember instructions, but may have difficulties acquiring new information in work settings. (*Id.*). Dalton had difficulty completing serial threes and sevens which suggested to Dr. Krabbe that he may have difficulty maintaining attention and focus, but Dalton displayed adequate task persistence and no indications of distraction. (*Id.*). Further, because Dalton functioned within adequate limits of

---

[2] School records indicate that at age 13, Dalton had a full-scale IQ of 97. (Tr. 1390).

intellectual functioning he could understand and respond to supervisor feedback and adequately relate to co-workers. (*Id.*).

On March 17, 2022, state agency reviewing psychologist Irma Johnson, Psy.D. found Dalton had mild limitation regarding interacting with others and moderate limitations in understanding, remembering, or applying information, concentrating, persisting, or maintaining pace, and adapting or managing oneself. (Tr. 168). Dr. Johnson found that Dalton was not significantly limited in his ability to remember locations, work-like procedures, and very short and simple instructions. (Tr. 173). However, Dalton was moderately limited in his ability to understand and remember detailed instructions. (*Id.*). Dalton was also moderately limited in his ability to carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to changes in the work setting. (Tr. 174). Otherwise, she found that Dalton was not significantly limited. (*Id.*). On reconsideration, Janet Souder, Psy.D., found Dalton had moderate limitation interacting with others and further limited him to occasional and superficial interactions with others. (Tr. 182, 187-88). Otherwise, she affirmed Dr. Johnson's findings. (Tr. 187-88).

On April 11, 2022, state agency reviewer Abraham Mikalov M.D., found that Dalton had the following residual functional capacity: occasional lifting and/or carrying 20 pounds and frequently lifting and/or carrying 10 pounds; six hours of sitting, standing or walking in an eight hour workday; frequent stooping, kneeling, crouching or crawling; frequent climbing of ramps and stairs but no climbing of ladders ropes or scaffolds; and occasional reaching in front or overhead with his right upper extremity.(Tr. 170-171). On reconsideration, Stephen Koch, M.D., further limited Dalton to occasional crawling and found that Dalton had unlimited ability to

reach in front and/or laterally. (Tr. 184-85). Additionally, Dr. Koch limited Dalton to frequent pushing and pulling with his right upper extremity. (Tr. 184). Dalton was also to avoid all exposure to hazards including machinery and heights. (Tr. 185).

On January 30, 2023, CNP Fascione completed a mental impairment questionnaire. (Tr. 1454-57). The questionnaire states that CNP Fascione began treating Dalton on November 9, 2022. (Tr. 1454). CNP Fascione noted that Dalton was experiencing memory loss, inability to finish tasks, inability to work, and mood instability. (*Id.*). Dalton's prognosis on those issues was "unknown." (*Id.*). CNP Fascione also noted that Dalton did not have a low IQ or reduced intellectual functioning. (Tr. 1456). According to CNP Fascione, Dalton had marked limitations in understanding, remembering, and applying information and interacting with others and had an extreme limitation in maintaining concentrations, persistence, or pace. (*Id.*). She anticipated that Dalton would be absent from work more than four days per month. (Tr. 1456-57).

### D.  Administrative Hearing Evidence

Dalton testified at the hearing that he lives with his wife. (Tr. 66). He graduated from high school. (Tr. 67). He has a driver's license and can drive by himself. (Tr. 66). However, he is not comfortable driving at night because "headlights really screw with" him. (Tr. 67).

In Dalton's previous three jobs, he drove a truck. (Tr. 68-70). These jobs required him to lift anywhere from 60 to 200 pounds. (*Id.*). Prior to that, Dalton worked making pepperoni. That position required him to move rolling racks that weighed 500 to 600 pounds. (Tr. 71-72).

According to Dalton, he has been disabled since July 14, 2021, when he had a motorcycle accident. (Tr. 72-73). Dalton explained that he cannot work because his back and pelvis hurt after 20 minutes of standing. (Tr. 73). He also stated that his right arm does not work correctly anymore, because it was not fixed properly after the accident. (*Id.*). His doctor told him in order

to fix his right arm, it would have to be broken again. (Tr. 79). Dalton expressed a desire to have his hand fixed. (*Id.*). Dalton explained that he cannot hand anything out on his right side, such as handing somebody money. (*Id.*). He also has little strength in his right hand. (Tr. 79-80).

Dalton endorsed having memory issues, explaining that if he is given instructions to do something, he can only remember half of them. (Tr. 73-74). He explained that his mind wanders in the middle of completing a task and he forgets what he is supposed to be doing. (Tr. 74). Asked if he has had problems remembering how to get home when he is driving, Dalton responded that he has not because he never drives more than 10 to 30 miles away. (Tr. 74-75).

Dalton described his typical day as him waking up between seven and eight o'clock in the morning, but he often gets up at five o'clock. (Tr. 75). When he wakes up, he has nothing to do because he does not have money, causing him to "mope around" the house. (*Id.*). He can no longer carve wood because of pain in his wrist. (*Id.*). He tries to keep his mind busy but ends up sitting around. (*Id.*).

Asked if he had the money to do so, would he be able to do things outside of the house, Dalton responded that there would "[p]robably" be things he could do. (*Id.*). He explained that he has a brother in Pennsylvania that he would go to see if he could afford it. (*Id.*).

Dalton stated that he had been evicted from a home due to his inability to pay rent, causing him and his wife to downsize to a smaller apartment. (Tr. 75-76). A lot of his belongings are in storage, and he finds himself constantly going down the street to the storage facility to get something they need, bringing it home, and then taking it back. (Tr. 76).

Asked whether his memory problems are related to his short-term memory, Dalton answered that it was, he often forgets day-to-day things, and if he is told something in the morning, he will forget it by the afternoon. (*Id.*). However, he also stated that he has a 30-year-

old daughter, and there are 10 years from her life that he cannot remember. (*Id.*). Due to his short-term memory problems, Dalton does not cook on the stove because he is afraid he might leave it on. (Tr. 77).

Since his accident, Dalton has had problems with his anger. (Tr. 77). Specifically, he had a road rage incident the first or second time he drove after the accident. (Tr. 78). He felt as though the other driver was "tailing" him with his high beams on, and he got mad. (*Id.*). He explained this is why he does not drive very far. (*Id.*).

Dalton expressed that he cannot sit for long periods due to pain in his back. (*Id.*). He frequently gets up to have a cigarette and take his dogs outside. (*Id.*). When he is doing those tasks, he will sit on a bucket or chair and watch a YouTube video on his phone. (*Id.*).

Next the VE testified that Dalton had the following past work experience: water truck driver, DOT 905.663-014, medium exertion preformed at heavy, SVP 4, semi-skilled; cut off saw operator, DOT 667.682-022, medium exertion performed at very heavy, SVP 4, semi-skilled; light truck driver, DOT 906.683-022, medium exertion performed at very heavy, SVP 3, semi-skilled; flatbed truck operator, DOT 905.663-014, medium exertion performed at very heavy, SVP 4, semi-skilled; and laborer, DOT 529.687-130, heavy exertion, SVP 2, unskilled. (Tr. 82-83).

According to the VE, a hypothetical individual of Dalton's age, education, and past work experience who was limited to light work, occasionally lifting and carrying 20 pounds and frequently 10 pounds; sitting, standing, or walking up to six hours of the workday with only frequent pushing and pulling on the right upper extremity; could occasionally reach overhead on the right side, frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; could frequently stop, kneel, crouch, and occasionally crawl; never exposed to unprotected

heights, moving machine parts, and never operating a motor vehicle; limited to performing

simple, routine, and repetitive tasks but not at a production rate pace, could occasionally interact

with supervisors, coworkers, and the public, and could tolerate occasionally changes in a routine

work setting could not perform Dalton's past work. (Tr. 83-84). However, this hypothetical

individual could perform the jobs of mail sorter, DOT 222.687-022, light exertion, SVP 2,

unskilled with 117,000 jobs in the national economy; merchandise marker, DOT 209.587-034,

light exertion, SVP 2, unskilled with 136,000 jobs in the national economy; and router, DOT

222.587-038, light exertion, SVP 2, unskilled with 25,000 jobs in the national economy. (Tr. 84).

If the first hypothetical individual were further limited to sedentary work, that individual

could not perform Dalton's past work. (Tr. 85). The ALJ did not inquire whether this

hypothetical individual could perform other jobs in the national economy.

If the first hypothetical individual were limited to standing and walking for two hours per

workday, it would limit the individual to sedentary work. (Tr. 85).

If the first hypothetical individual were limited occasionally handing with the dominant

right upper extremity, it would preclude all light work and that individual would not be able to

perform the jobs listed by the VE. (Tr. 85-86).

## IV.    The ALJ's Decision

1.    The claimant meets the insured status requirements of the Social Security
      Act through December 31, 2024 (6D).

2.    The claimant has not engaged in substantial gainful activity since July 14,
      2021, the alleged onset date (20 CFR 404.1571 et seq.).

3.    The claimant has the following severe impairments: traumatic brain injury,
      right ulna/radius fracture/ arthritis of right hand, bilateral sacral fracture
      /arthritis of right hip, depressive disorder, anxiety disorder/ adjustment
      disorder with depression and anxiety, attention deficit hyperactivity
      disorder, neurocognitive disorder, substance abuse disorder (20 CFR
      404.1520(c)).

14

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform <u>light work</u> as defined in 20 CFR 404.1567(b) except he can occasionally lift/carry twenty pounds and ten pounds frequently. He can sit for six hours, stand for six hours, and walk six hours in an eight-hour day. He can frequently push and pull and occasionally reach overhead with the right upper extremity. He can frequently climb ramps and stairs and never climb ladders, ropes, or scaffolds. He can frequently stoop, kneel, crouch and occasionally crawl. He can never work at unprotected heights or have exposure to moving mechanical parts and no operating a motor vehicle. He can perform simple routine and repetitive tasks but not at a production rate pace (for example assembly line work). He can occasionally interact with supervisors, co-workers, and the public. He can tolerate occasional changes in a routine work setting.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on September 22, 1970 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from July 14, 2021, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 40-55).

15

## V.     Law & Analysis

### A.     Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.     whether the claimant is engaged in substantial gainful activity;

2.     if not, whether the claimant has a severe impairment or combination of impairments;

3.     if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.     if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir.

2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears

the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled

to benefits. 20 C.F.R. § 404.1512(a).

### B.     Standard of Review

This Court reviews the Commissioner's final decision to determine if it is supported by

substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g);

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial

evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103

(2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" *Id.* quoting *Consolidated Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the

16

Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 749 (6th Cir. 2007).

## VI.     Discussion

Dalton raises the following issue for this Court's review: "The Administrative Law Judge's finding that Plaintiff retained a residual functional capacity for light work is not supported by substantial evidence." (ECF Doc. 8, p. 7).

Dalton argues that the ALJ's finding lacks substantial support because she failed to properly evaluate his right-upper extremity and cognitive impairments. (*Id.* at p. 1). Regarding his right upper extremity, Dalton argues that the ALJ improperly discounted diagnostic findings of a malunion of the distal radius and examination finding of his limited ability to pronate and supinate his wrist by finding he did not follow treatment advice. (ECF Doc. 8, p. 8). In response, the Commissioner argues that the ALJ properly found Dalton non-compliant with his doctors' recommendations. (ECF Doc. 10, p. 10). I find that the ALJ did not follow agency guidelines where she found him to be non-disabled based upon his failure  to follow his doctors' treatment advice.

Before proceeding to Step Four of the sequential analysis laid out in the regulations, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011), citing 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p. Although these are not adversarial proceedings, *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019), and the ALJ serves as a neutral factfinder, *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000), it is not incumbent on the ALJ to advance the claimant's case.

*Richardson v. Perales*, 402 U.S. 389, 410 (1971). Therefore, "while the ALJ must ensure that every claimant receives a full and fair hearing, the ultimate burden of proving entitlement to benefits lies with the claimant." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023) (internal citations and marks omitted).

Social Security Ruling ("SSR") 16-3p lists the factors relevant to the ALJ's determination of persuasiveness of a claimant's statements regarding "the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers v. Commissioner*, 486 F.3d 234, 247 (6th Cir. 2007). These factors include: the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain; and, "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3P, 2017 WL 5180304, at *7-*8; *see, e.g.*, *Morrison v. Commissioner*, No. 16-1360, 2017 WL 4278378, at *4 (6th Cir. Jan. 30, 2017). An ALJ is not required to expressly address all the factors listed in SSR 16-3p they but should sufficiently articulate the assessment of the evidence to assure the reviewing court that the ALJ considered all relevant evidence. *Cross v. Commissioner*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

SSR 16-3p also instructs an ALJ how to consider a claimant's statements regarding intensity, persistence, or functional limiting effects of their symptoms in relation to treatment sought for those symptoms.

> [I]f the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's

symptoms are inconsistent with the overall evidence of record. We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.

SSR 16-3p at *9. "Attempts to obtain treatment may show that symptoms are intense and persistent; conversely, a lack of such efforts may show that an individual's symptoms are not intense or persistent." *Jill L. v. Comm'r of Soc. Sec.*, 2023 WL 4757601, at *7 (S.D. Ohio 2023), citing SSR 16-3p at *9. However, the ALJ "will not find an individual's symptoms inconsistent . . . on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." SSR 16-3p at *9. An ALJ must consider these reasons "before drawing an adverse inference from the claimant's lack of medical treatment." *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 (6th Cir. 2016).

Here, the ALJ found that Dalton's statements regarding the intensity, persistence, and limiting effects of his symptoms not entirely consistent with the medical and other evidence in the record. (Tr. 45). In explaining this finding, the ALJ stated numerous times that despite attending some assessments and medical visits there was no evidence in the record that Dalton followed the treatment plan advised by his doctors. For example, the ALJ made the following findings:

- "[T]here was no evidence he followed the advice and attended occupational therapy to improve his right upper extremity," and "the claimant attended assessments [regarding his right upper extremity]. However, there was no evidence he followed the recommendations after completing the evaluations." (Tr. 46).

- "The claimant was advised he could undergo surgery for his right wrist. However, there was no probative evidence he had the surgery or returned to the orthopedic physician for an assessment of his right upper extremity. (Tr. 47).

The ALJ mentions that Dalton did not follow medical treatment advice regarding his physical impairments at least six times throughout the decision. (Tr. 46-47).

While I agree with the ALJ that a review of the medical records demonstrates that Dalton may not have followed some of the treating advice from his doctors, I do not believe that she could find Dalton's statements regarding the intensity, persistence, and limiting factors of his right upper extremity limitations non-persuasive without first asking why he did not follow through with treatment per agency regulations. There is no evidence in the record indicating why Dalton did not seek further treatment for his right upper extremity. As SSR 16-3p suggests, a claimant may not receive recommended treatment for a myriad of reasons not relating to the condition, such as monetary reasons or a lack of access to transportation for appointments.

As acknowledged by the ALJ, Dalton endorsed great stress regarding his financial status. (*See, e.g.,* Tr. 1458). Dalton also expressed issues with memory and road rage which kept him from driving far from his home. (Tr. 74-75). Accordingly, there may be legitimate reasons beyond the intensity, persistence, and limiting factors of his impairment as to why Dalton did not seek further treatment for his right upper extremity. The ALJ did not inquire into why Dalton did not follow the prescribed treatment protocol. I therefore agree with Dalton that the RFC is not supported by substantial evidence when the ALJ discounted the necessity of limitation for his right upper extremity because Dalton did not receive the treatment recommended by his doctors. As such, I recommend that the District Court remand the case so that the ALJ may properly comply with SSR 16-3p.

In addition to the issue with his right upper extremity, Dalton also argues that "the ALJ's failure to properly evaluate [his] neurocognitive disorder also renders the decision as lacking the support of substantial evidence." (ECF Doc. 8, p. 9). According to Dalton, "the ALJ failed to properly evaluate his consistent cognitive complaints confirmed by a 34-point drop in his full-scale IQ from the age of 13 to the time of the psychological consultative evaluation." (ECF Doc. 11, p. 2). In contrast, the Commissioner argues that "[s]ubstantial evidence supports the ALJ's determination as to [Dalton's] mental limitations." (ECF Doc. 10, p. 11). I agree with the Commissioner.

An ALJ is not obligated to incorporate a medical opinion into an RFC. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). This is because the Social Security Act instructs that the ALJ, not a doctor, determines the RFC. *See Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 439 (6th Cir. 2010). An RFC determination is a legal decision rather than a medical one, and the development of a claimant's RFC is solely within the province of an ALJ. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009).

Notwithstanding the fact that the ALJ was not required to incorporate the medical opinion into the RFC, and Dalton's contentions to the contrary, the ALJ did discuss Dalton's IQ when discussing his RFC. In the decision, the ALJ states "The claimant was administered the Wechsler Adult intelligence Scale which yielded [a] full scale score of 63 . . .." (ECF Doc. 7, p. 49). The ALJ also noted that this score, and others from that test, were in the borderline to extremely low range. (*Id.*). The ALJ concluded that Dalton's medical record and his statements regarding his ability to perform tasks throughout the day supported a finding that he was able to perform simple routine tasks. (*Id.* at p. 50). Further, despite the alleged failure, the ALJ did incorporate mental limitations into Dalton's RFC. For example, she limited him to simple routine

and repetitive tasks, but not at a production rate pace. (Tr. 45). Accordingly, Dalton's statement that the ALJ failed to consider his IQ is not supported by the record and he has not directed this Court to other error with regard to his cognitive abilities. I therefore decline to recommend remand on this basis.

## VII.    Recommendation

Because the Administrative Law Judge failed to apply proper legal standards regarding Dalton's treatment for his right upper extremity, I recommend that the Commissioner's final decision denying Dalton's application for disability insurance benefits be vacated and that Dalton's case be remanded for further consideration of his residual functional capacity regarding his right upper extremity, but that the Administrative Law Judge need not reconsider his cognitive abilities.

Dated: December 30, 2024

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

## Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28

U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).